**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DARIUS BOOKER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 11-00407-KD-M** |
| | ) | |
| **WINN-DIXIE MONTGOMERY, LLC,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on the Motion for Summary Judgment (Doc. 31) and supporting brief (Doc. 32) and exhibits (Doc. 33) filed by Defendant Winn-Dixie Montgomery, LLC ("Winn-Dixie") pursuant to Rule 56 of the Federal Rules of Civil Procedure, along with Plaintiff's Response in Opposition (Doc. 37) and supporting exhibits (Doc. 38), and Winn-Dixie's Reply to said response (Doc. 43).   Winn-Dixie has also filed a separate Motion to Strike (Doc. 44) regarding certain portions of Plaintiff's evidentiary submissions.   After considering the evidence and arguments presented by both parties, and for the reasons stated herein, Winn-Dixie's Motion for Summary Judgment (Doc. 31) is due to be **GRANTED in part** and **DENIED in part**, and the Motion to Strike (Doc. 44) is due to be **DENIED in part** and is otherwise **MOOT**.

**I.      Procedural History**

Plaintiff commenced this action on July 25, 2011.   (Doc. 1).   On March 7, 2012, Plaintiff filed his First Amended Complaint (Doc. 17), alleging the following causes of action against Winn-Dixie: (1) Plaintiff was subjected to a hostile work environment through sexual harassment and was constructively discharged, in violation of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), as amended by the Civil Rights

1

Act of 1991, 42 U.S.C. § 1981a; (2) Plaintiff received disparately lower pay and was not given a promotion on the basis of his race, in violation of Title VII and 42 U.S.C. § 1981; (3) Winn-Dixie "invaded the privacy of Plaintiff, by . . . intruding into Plaintiff's private seclusion by making statements or inquiries invasive of his privacy[,]" (Doc. 17 at 9, ¶ 43), in violation of Alabama law; and (4) Winn-Dixie engaged in negligent and/or wanton supervision, training, and/or retention of its agents and employees in violation of Alabama law. The Court has jurisdiction over all claims in this matter pursuant to 28 U.S.C § 1331, § 1343, § 2201, § 2202, and supplemental jurisdiction.

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Rule 56(c) governs procedures and provides as follows:

> **(1)** ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2)** ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3)** ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

> **(4)** ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Defendant, as the party seeking summary judgment, bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

If the non-moving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether the non-moving party has met her burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

### III.   Facts[1]

Winn-Dixie owns and operates food supermarkets throughout south Alabama and other locations.   (Doc. 33-5 at 2, ¶ 2).   On or about November 24, 2008, Plaintiff Darius Booker ("Booker"), a black male, was hired at Winn-Dixie's Monroeville, Alabama store ("the Store") as a part-time Meat Associate in the Store's Meat Department.   (Doc. 33-1 at 33-34; Doc. 33-5 at 2, 5, ¶¶ 3, 12).   When first hired, every new Winn-Dixie employee is provided a copy of the company's Associate Handbook which details and explains a number of policies implemented and maintained by the company.   (Doc. 33-5 at 3, ¶ 7; Doc. 38-12).

In addition to Winn-Dixie's "Equal Employment Opportunity Policy," the handbook sets out its "Policy Against Discrimination and Harassment of Associates and Applicants" ("the discrimination/harassment policy").   (Doc. 38-12 at 7-8).   This policy prohibits discrimination or harassment of any Winn-Dixie associate or job applicant by anyone in the workplace based on, *inter alia*, the associate's or applicant's race, color, sex, or sexual orientation.   (Id.).   This policy forbids as sexual harassment "unwelcome sexual advances, requests for sexual favors, sexual innuendoes, jokes about gender-specific traits, other verbal or physical conduct of a sexual nature, and any harassing behavior toward an Associate because of the Associate's gender . . .[which] explicitly or implicitly affects an Associate's employment, unreasonably interferes with an Associate's work performance, or creates an intimidating, hostile, or offensive work environment." [2]   (Id. at 8).

---

[1]  The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [the Plaintiff,] the nonmoving party."   Benson v. Tocco, Inc., 113 F.3d 1203, 1207 (11th Cir. 1997).

[2]  Booker identified his signature at the bottom of a copy of Winn-Dixie's "Harassment Policy" dated November 26, 2008.   (Doc. 38-7 at 4, p. 74).   However, he claims he did not receive an Associate Handbook while employed with Winn-Dixie.   (Id. at 26, p. 208).

Winn-Dixie maintains a "step structure" pay scale setting starting pay ranges for certain employees.   (Doc. 33-3 at 7, p. 55; Doc. 33-5 at 4, ¶ 11).   Consistent with the 2009 starting-pay range for a part-time Meat Associate, Booker's starting pay was $6.88 per hour (Doc. 33-5 at 5, ¶ 12; Doc. 33-10).   Effective July 24, 2009, Booker's wages were increased to $7.25 per hour.   (Doc. 33-5 at 5, ¶ 13).   On January 14, 2010, his wages were increased to $7.42 per hour, an amount within the 2010 starting-pay range for his position.   (Id.; Doc. 33-11).

Market Manager Earnest Leprell Bodiford ("Bodiford"), a white male and supervisor the Store's Meat and Seafood Departments, was Booker's direct supervisor.   (Doc. 33-1 at 6, p. 84; Doc. 33-15 at 2-3).   As a part-time Meat Associate, Booker would clean the Meat Department's cutting boards, floor, cooler, and freezer, check the dates on meat, wrap meat, grind meat, unload meat deliveries, and assist in the Seafood Department as needed.   (Doc 38-7 at 4, 6, pp. 75, 89-91).   Booker typically worked from 3:00 p.m. to 9:00 p.m. on weekdays and alternated between morning and evening shifts on weekends.   (Id. at 7, pp. 94-95).   Most evenings Booker would be the Meat Department's "closer," responsible for cleaning the department so that it would be ready for the next day and ensuring that the display cases looked neat and had no empty slots.   (Id. at 6-7, pp. 92-93).

In addition to Meat Associates, the Meat Department was staffed by Meat Cutters whose primary responsibilities were to cut meat to company standards and customer specifications. (Doc. 33-15 at 3, ¶¶ 5, 8).   To a lesser degree, Meat Cutters would also assist with organizing display cases and unloading and stocking meat.   (Id., ¶ 8).   Meat Cutters generally worked morning shifts and were usually gone by evening.   (Id., ¶ 6; Doc. 33-1 at 6, p. 81).   Meat Cutter is considered a promotion from Meat Associate, as a Meat Cutter's pay scale is higher and

5

the position offers more opportunities for advancement – for instance, an employee cannot become an Assistant Market Manager without first having worked as a Meat Cutter.   (Doc. 38-6 at 22).   Also, full-time Meat Cutters have the authority to direct the actions of Meat Associates and can order them to wrap meat, clean, and do "whatever needs to be done in the department." (Doc. 38-8 at 10-12).

Booker claims he did "way more" than what the job description of a part-time Meat Associate called for, mostly involving meat cutting.   (Doc. 38-7 at 4-5, pp. 76-77; Doc. 38-15). He claims he cut "different types of meat," that he cut meat "constantly" and "every day," and that when the Meat Cutters left he would "have to basically be a full-time meat cutter."   (Doc. 38-7 at 4-5, pp. 75, 78).   Generally, the Meat Department's "closer" would be the only employee working in the department after 5:00 p.m. each day and was expected to cut meat if a customer asked from then until closing.   (Doc. 38-10 at 6).   Booker estimates that in an average five- or six-hour shift, he would spend at least three of those hours cutting meat.   (Doc. 38-7 at 6, p. 89).   Market Manager Bodiford and Assistant Meat Manager Chris Marshall ("Marshall") would ask Booker to cut meat during his shift, and Booker would cut "basically []the same types of meat" as Bodiford did.   (Id. at 5, pp. 79-80).   Booker did not have any training in meat cutting prior to working at Winn-Dixie and learned mostly from watching others and through trial and error.   (Id., pp. 78-79).   Monica McCants ("McCants"), another store employee, frequently saw Booker cutting meat.   (Doc. 38-3 at 2, ¶ 3).   Bodiford admits that he trained Booker to cut rib eye to assist customers on a limited basis when a Meat Cutter was unavailable.   (Doc. 33-15 at 3, ¶ 9).   Winn-Dixie's official job description for a part-time Meat Associate does not specifically include cutting, weighing, pricing, or wrapping meat,

though Meat Associates are expected to "[p]erform other job-related duties as assigned by

management."   (Doc. 38-15; Doc. 38-6 at 19).

### a.   Meat Cutter Job Openings

Winn-Dixie maintains "Job Posting Policies" setting out a formal procedure by which

Winn-Dixie employees learn of and apply for job vacancies.[3]   (Doc. 33-5 at 4, ¶ 8; Doc. 33-9).

In relevant part, the "Job Posting Policies" state:

> Through job posting, qualified associates are considered before external applicants for
> position vacancies.   Promotions are earned when it becomes evident that you have the
> ability and capacity for more responsible job duties.
>
> 1.   When the company desires to fill a vacancy, it will post a notice of that
>       vacancy, for a period of three (3) working days.   The notice will include an
>       explanation of the job along with the essential job functions, job standards,
>       physical demands, and the minimum qualifications required, as outlined in the
>       job description.   Please review those requirements before filing a job posting.
>       Vacancies will be posted on the Job Tracking System (JTS).
>
> 2.   Associate's [*sic*] who are interested in a vacancy and have not previously
>       submitted a *Job Request* for the position during the annual Job Fair, must
>       complete a *Post for Job* form which is available on the JTS, within the *three
>       (3) working day period*.   All associates are eligible to participate; however,
>       probationary associates and associates that have not been in their current job
>       for six (6) months will be disqualified.
>
> 3.   All associates who express an interest in the position will be evaluated by
>       management in accordance with the company's policies and procedures based
>       on merit and ability as listed in the Retail Store Policies, along with the
>       candidate's   interpersonal   skills,   communication   skills   and
>       leadership/motivational skills, as applicable.   The Company will fill the
>       vacancy at its discretion.

 (Doc. 33-9).

Both internal and external applicants must apply for a vacancy by submitting a "Post for

Job" form available on the JTS within the three-working-day period.   (Doc. 33-5 at 4, ¶ 8; Doc.

---

[3]  Booker signed a copy of Winn-Dixie's "Job Posting Policies" on November 26, 2008, (Doc. 33-9),
though he claimed at deposition that he was not familiar with Winn-Dixie's job application process.
(Doc. 33-1 at 20, pp. 145-46).

33-9).   A computer kiosk at the front of the Store can be used by anyone to apply for jobs on the JTS, while Store employees are also able to access the JTS through other Store computers if the kiosk is unavailable.   (Doc. 33-3 at 5, pp. 27-28).

Around January 2010, openings occurred in the Meat Department for one full-time and one part-time Meat Cutter.   (Doc. 33-5 at 5, ¶ 14).   Store Director Jimmy Jean ("Jean"), a black male, was responsible for recruiting and hiring at the Store as well as managing the Store's associates and department managers, among other duties.   (Id. at 2-3, ¶¶ 1, 3-4).   Jean claims he posted the two Meat Cutter positions to the JTS[4] and also taped a sign in the Store's front window next to the door announcing "Now hiring Meat Cutters, part-time, full-time." (Id. at 5, ¶ 15; Doc. 33-3 at 4-6, pp. 24, 29-31).   The sign remained in the window for a couple of months. (Doc. 33-3 at 6, pp. 30-31).

Booker claims that he always entered the Store through the front entrance when arriving for work and that no such sign was placed in the window.   (Doc. 38-2 at 2-3, ¶ 3).   Job vacancies were always posted at the Store on a clipboard located near the time clock, which co-worker McCants would regularly check.   (Doc. 38-3 at 2-3, ¶ 4-5).   McCants claims that no meat cutter job notices were posted on the clipboard, in the Store window, or anywhere else in the Store in the first half of 2010.   (Id. at 3, ¶ 6).   Regardless, Booker never applied for a Meat Cutter position – in fact, never used the JTS to review or apply for any vacancies – while

---

[4]  Booker disputes that these Meat Cutter positions were posted to JTS, as no job postings were produced by Winn-Dixie in discovery in spite of Booker's request for "a copy of all jobs posted for positions (including electronic and paper postings) in the Meat Department at Defendant's Monroeville, Alabama location, including the Meat Cutter position, from 1/1/09 to 7/1/10."   (Doc. 38-1 at 6).   Winn-Dixie responds that it "produced the Job Descriptions for the part-time and full-time Meat Cutter positions, which is the format in which the positions are posted on the JTS."   (Doc. 43 at 3, ¶ 23 (citing no evidence)).

employed with Winn-Dixie.   (Doc. 33-1 at 17, p. 135, 146-47; Doc. 33-3 at 10, pp. 91-92; Doc. 33-5 at 5, ¶ 17).

Several external candidates applied for the Meat Cutter positions, including Freddie Lindsey ("Lindsey"), a white male.   (Doc. 33-5 at 5, ¶ 16).   Lindsey had been a Store customer who had inquired with Bodiford about Meat Cutter openings.   (Doc. 38-6 at 5-6).   Bodiford, knowing there was an opening, told Lindsey to fill out a computer application.   (Id.).   On January 28, 2010, Zollie McBride ("McBride"), a white male, also submitted an application on the JTS, though for a full-time Meat Associate position.   (Doc. 38-4 at 2).   McBride was a friend of Assistant Meat Manager Marshall, who had encouraged McBride to apply for a job at Winn-Dixie, though without identifying a specific vacancy or position to him.   (Doc. 38-10 at 3-4).

Jean selected McBride, Lindsey, and several other applicants and scheduled them for interviews with Bodiford and Store Co-Director Evangelia Penn (a black female), as well as separate interviews with Jean.   (Doc. 33-5 at 4,6, ¶¶ 9, 18-19).   During Lindsey's interview, Jean learned that Lindsey had thirteen years of experience as a meat cutter and had previously been employed as a Meat Cutter with Winn-Dixie; McBride also claimed in his interview that he had some experience as a meat cutter.[5]   (Id. at 6, ¶ 20; Doc. 38-8 at 9).   Both Bodiford and Penn provided positive feedback on Lindsey and McBride, and Jean himself felt that both had interviewed well.   (Doc. 33-5 at 6, ¶ 21).

After interviews were concluded, Jean made the final decision to hire Lindsey as a full-time Meat Cutter and McBride as a part-time Meat Cutter.   (Doc. 33-5 at 6, ¶ 22; Doc. 38-8 at 8-9).   McBride began work on February 25, 2010, and Lindsey began on March 2, 2010.

---

[5]  Booker correctly notes that McBride's Winn-Dixie application does not list any meat-cutting experience.   (Doc. 38-4).

9

(Doc. 33-5 at 6, ¶ 22).   Because McBride had advised him that he had some experience as a meat cutter, and because he had "a good basic knowledge of cutting meat," Jean set McBride's starting pay at $8.14 per hour, the maximum allowed under the starting pay range set for Winn-Dixie part-time Meat Cutters at that time.   (Id. at 6-7, ¶¶ 23-24; Doc. 38-8 at 8-9).

Bodiford scheduled McBride to work with Booker so that Booker could show him the layout of the Meat Department, how to break down saws, and how to clean up.   (Doc. 33-1 at 15, p. 126; Doc. 33-4 at 6, p. 114; Doc. 33-15 at 4, ¶ 11).   Bodiford's standard practice with new hires was to initially team them with a person responsible for cleaning so that they could learn standard department cleaning practices.   (Doc. 33-4 at 6, pp. 114, 117; Doc. 33-15 at 4, ¶ 11).   After McBride's introductory period, Bodiford and Assistant Meat Manager Marshall provided him with more extensive training in meat cutting and Winn-Dixie processing standards. (Doc. 33-15 at 4, ¶ 12; Doc. 38-6 at 14-15, 25-26).   McBride was also given a Winn-Dixie manual detailing company meat cutting and processing standards to study on his own, though anyone working in the Meat Department could access the manual and was expected to review it. (Doc. 38-6 at 25-27).   Booker and McBride worked together about sixteen or eighteen hours a week, with the two men sometimes filling in for each other, and "most of the time, [McBride] was doing basically the same thing [Booker] was doing[.]"   (Doc. 33-1 at 10, p. 98).   Booker showed McBride how to wrap, price, and grind meat, check the dates on the meat, and clean the Meat Department.   (Id. at 10, 15, pp. 98, 127).

Booker believed that McBride had been hired as a Meat Associate rather than a Meat Cutter because he cut more meat than McBride and had to teach him different techniques of cutting meat.   (Doc. 33-1 at 9-10, pp. 96-98).   Booker showed McBride how to cut "a top round steak . . . ribeyes, porterhouse, top sirloin, [and] bottom round, . . . how to make cube

steak[,]" and how to cut pork, poultry, veal, and lamb.   (Id. at 15, pp. 127-28).   Both McBride and Marshall told Booker that McBride had no prior experience working with meat.   (Doc. 38-7 at 13, p. 134).   McBride himself told Booker that he was a Meat Associate and expressed his desire to learn how to cut meat and become a Meat Cutter.   (Id. at 10, p. 106).   At some point, Jean promoted McBride to full-time Meat Cutter.   (Doc. 38-8 at 15).   Some time after Booker quit on May 8, 2010, Winn-Dixie began requiring that its Meat Departments have Meat Cutters on staff until closing.   (Doc. 38-6 at 20-21).

      **b.**    **Sexual Harassment**

Booker and Freddie Lindsey began working together in the Meat Department on March 2, 2010.   (Doc. 33-1 at 22, p. 155; Docs. 33-12 & -14).   Sometime in mid-April 2010, when Lindsey and Booker were alone together in the department, Lindsey asked Booker how he felt about men.   (Doc. 33-1 at 24, pp. 161-62, 64).   When Booker protested that he didn't "go that way" and didn't "want to talk about that," Lindsey said that Booker would "do anything for money," asked him if he was a virgin, and then asked him if he would let Lindsey "suck [his] dick" if Lindsey gave him $500.   (Id., pp. 162-63).   Booker again rebuffed Lindsey and then left the room.   (Id.).

As explained in Winn-Dixie's Associate Handbook, a Winn-Dixie employee who believes he or she has been discriminated against or harassed on the job "must report the matter pursuant to [the] Company's Open Door Policy."   (Doc. 33-5 at 3, ¶ 6; Doc. 33-7 at 2).   The Open Door Policy establishes the following three-step mechanism for reporting concerns:

**Step One:** Discuss your concerns with your immediate Supervisor.   It is their responsibility to listen to your concerns and do their best to resolve them, if possible.

**Step Two:** If your immediate Supervisor has not answered or satisfactorily addressed your concerns within a period of seven days, discuss your concerns with a second level manager.

**Step Three (Alternate Step):** If for any reason you prefer to discuss your concerns with a Human Resources Representative, you may contact your department, facility, or Regional Human Resources Representative . . .

An Associate may also call the Winn-Dixie Involved Associate Line ("W-DIAL") at 1-877-919-3425.   This is a confidential reporting system which can be used anonymously and is accessible via the internet or by phone . . .

(Doc. 33-8).

Booker first reported Lindsey's comments to Seafood Manager Sherry Davis ("Davis"), and then to fellow employees Eric McCorvey, Seafood Associate Mattie McPherson, and McCants, none of who were Booker's manager.   (Doc. 33-1 at 25, pp. 165-66; Doc. 38-7 at 26, pp. 205-07).   Davis told Booker that he should "go by chain of command" and tell his manager, Bodiford, about it.   (Id. at 25-26 pp. 168-69).   However, Davis later told McCants that she reported Booker's complaint to Store Director Jean.   (Doc. 38-3 at 3, ¶ 8).   Booker also reported to Bodiford and Marshall about Lindsey's comments, telling Bodiford that he was "about to kill Freddie for making all these gay comments towards [him]" and that he was "fixing to hurt him."   (Id. at 25-26, pp. 167, 172).   Bodiford told Booker that he would "take care of it" and that he would report the incident to Jean, then left the Meat Department.   (Id. at 26-27, pp. 172-74).   Booker never followed up with Bodiford about whether he reported the incident to Jean.   (Id. at 27, 29, pp. 174, 182; Doc. 33-4 at 7, p. 175).   Bodiford did not tell anyone about Booker's complaint, believing that "the situation was going to resolve itself."   (Doc. 38-6 at 8-9).   However, Winn-Dixie's harassment policy also requires that "[a]ny Associate, who believes another Associate has been subjected to discrimination or harassment, including Managers who receive notification from an Associate, must report the matter to [the] Company,

even when the Associate reporting the incident asks that the incident be kept confidential or that no action be taken."  (Doc. 33-7 at 2).   Both Bodiford and Jean admit that Bodiford violated this policy in not reporting Booker's complaint.   (Doc. 38-6 at 11-12; Doc. 38-8 at 3-4).

Lindsey's harassment continued after this initial incident, usually when he and Booker were working alone.  (Doc. 33-1 at 30, p. 186).   The week following the initial incident, Lindsey asked Booker if he had reconsidered his offer and if he would involve himself in anal sex for money.   (Id.).   Booker describes Lindsey's sexual remarks as "a constant thing."   (Id., p. 187).   "Every time [the two men] were alone," Lindsey would ask if Booker was a virgin, if he was he going to accept Lindsey's offer, and how he felt about anal sex; he would also claim that Booker was "just saying [he] ain't gay."   (Id. at 30-31, pp. 187-88, 190).   Lindsey would constantly talk about "gay things" such as doing anal sex and messing with other men, with Booker feeling that Lindsey kept "coming on to [him.]"   (Id. at 30-31, pp. 187, 191-92).   Sometimes Lindsey would tap or rub him on the shoulder, saying that he believed Booker was interested in his offer and was going to accept.   (Id. at 30, p. 188).   Booker would shove Lindsey's arm off of him at times.   (Id.).   Lindsey would also squeeze Booker's arms, commenting that he had a "nice structure [or] some nice arms" and that Booker was "a big fellow[.]"   (Id. at 31, pp. 190-91).   At least once Lindsey jokingly told Booker "don't let the man[] get you" and "[d]on't let those boys get you when you get off work, []you're going to do it eventually[,]" with Booker believing that Lindsey was referring to himself in the third person. (Id., pp. 191-92).

Bodiford also began teasing and joking with Booker about Lindsey after his first report of harassment.   He laughed about the situation, told Booker to "give Freddie some sugar," and

once sang him the song "sugar on my tongue, tongue, yippie, yippie, yum, yum."[6]   (Doc. 38-7 at 20, pp. 183-84).   He also began calling Lindsey "Freaky Freddie" to Booker when Lindsey wasn't around and would ask him, "[W]hat ol' Freaky Freddie been up to?"   (Id., p. 184).   Booker felt humiliated by Bodiford making light of Lindsey's harassment and not disciplining Lindsey.   (Doc. 38-7 at 27, pp. 210-11).   Booker complained of Lindsey's harassment to Bodiford a second time the week after the first incident of harassment, with Bodiford responding that "he was going to take care of it."   (Doc. 38-7 at 24, p. 199).   However, Bodiford and others continued to joke about the situation with Booker, and Booker did not complain of the harassment to Bodiford anymore because he was frustrated by Bodiford's teasing and lack of concern.   (Id., pp. 199-200).   Booker never followed up with Bodiford to learn if he'd reported the harassment to Store Director Jean, and Booker himself never went directly to Jean to report the problem.   (Id. at 24-24, pp. 200-01).   He also never utilized either reporting option available in Step Three of the Open Door Policy to report Lindsey's harassment.   (Doc. 33-1 at 29, pp. 182-83).   Bodiford has received no other complaints about Lindsey, either from other Winn-Dixie employees or from store customers.   (Doc. 33-15 at 4, ¶ 13).

Booker did not return to work at the Store after clocking out on May 8, 2010.   (Doc. 33-1 at 22, 36, pp. 156, 221-22; Doc. 33-12 at 4).   Employee time records show seven days in April and May of 2010 – April 2, 3, 9, 16, and 30; May 1 and 8 - in which both Lindsey and Booker were working at the store at the same time, with their shifts overlapping from approximately 11:00 a.m. to approximately 5:00 p.m.   (Doc. 33-5 at 8, ¶ 28; Docs. 33-12 & -14).   Booker estimates that during those days he would be alone with Lindsey anywhere between two and four hours.   (Doc. 38-7 at 24, p. 197).

---

[6]   A brief Google search reveals this to be a verse from the song "Sugar (Gimme Some)" by Trick Daddy.

IV.    **Analysis**

Before turning to its summary judgment analysis, the Court will address Winn-Dixie's motion to strike certain submissions in Booker's response.

a.  **Winn-Dixie's Motion to Strike (Doc. 44)**

Winn-Dixie's motion asks that the following portions of Booker's submissions in opposition to summary judgment be stricken: (1) paragraph 8 of the Declaration of Monica McCants (Doc. 33-3 at 3); (2) Booker's testimony that Assistant Meat Manager Marshall told him that McBride had no experience cutting meat, found on page 134 of Plaintiff's Exhibit G (Doc. 38-7 at 13); (3) Booker's testimony that McBride told him that he was a Meat Associate and wanted to learn how to cut meat, found on page 106 of Plaintiff's Exhibit G (Id. at 10); and (4) all references to the foregoing evidentiary submissions in Booker's Response.[7]

In Paragraph 8 of her Declaration, McCants states: "Seafood Manager Davis informed me that she had reported what Darius told her [regarding Lindsey's sexual comments] to Store Director Jimmy Jean."   Winn-Dixie argues that this statement constitutes inadmissible hearsay. However, the Court agrees with Booker that the statement is a valid statement by a party opponent.   Pursuant to Rule 801(d)(2)(d) of the Federal Rules of Evidence, such a statement is not hearsay if it "is offered against an opposing party and []was made by the party's agent or

---

[7] With the December 1, 2010 rules change to Rule 56 of the <u>Federal Rules of Civil Procedure</u>, it no longer appears that motions to strike submitted on summary judgment are appropriate. Revised Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."   The Advisory Committee Notes specify as follows: "Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. ***There is no need to make a separate motion to strike***. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial."   Fed. R. Civ. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments) (emphasis added).

employee on a matter within the scope of that relationship and while it existed."   Winn-Dixie argues that the matter was not within the scope of Davis's employment relationship because as Seafood Manager she was not Booker's supervisor and therefore not someone to whom Booker was to report harassment pursuant to the Open Door Policy.   However, Winn-Dixie overlooks another provision of its harassment policy, which requires all Winn-Dixie employees "who are put on notice, either by way of observation or *receipt of a complaint*, of harassment or discrimination" to report the matter to the company.   (Doc. 38-11 at 3).   Clearly, reporting harassment of an associate to company management, as a job-related duty, is a "matter within the scope of" any Winn-Dixie employee's employment relationship.   Therefore, McCants's testimony about what Davis told her is reducible to admissible form at trial, and the Motion to Strike is **DENIED** as to Paragraph 8 of McCants's Declaration (Doc. 33-3 at 3).

The Motion to Strike is **MOOT** as to the remaining submissions identified, as their consideration does not alter the Court's determination on the issues to which they are relevant.

**b.  Title VII/§ 1981 Race Discrimination Claims**

Booker alleges that Winn-Dixie, in violation of both Title VII and § 1981, unlawfully discriminated against him based on his race 1) by hiring McBride and Lindsey, both white men, as Meat Cutters instead of promoting Booker to Meat Cutter, and 2) by paying McBride higher wages for performing "basically the same" duties as Booker while cutting less meat than Booker. "Title VII prohibits an employer from discriminating against a person based on race.   42 U.S.C. § 2000e–2(a)(1).   Likewise, under 42 U.S.C. § 1981, an employee has the right to be free of intentional racial discrimination in the performance of a contract. The elements required to establish a § 1981 claim are the same as those required to establish a Title VII claim. Rice–

16

Lamar v. City of Ft. Lauderdale, 232 F.3d 836, 843 n.11 (11th Cir. 2000)."   Young v. FedEx Express, 432 F. App'x 915, 916 (11th Cir. 2011).

"A plaintiff in a Title VII case can establish a claim of intentional discrimination by presenting either direct or circumstantial evidence."   Dixon v. The Hallmark Companies, Inc., 627 F.3d 849, 854 (11th Cir. 2010).   A plaintiff may also use statistical proof.   See, e.g., Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1274 (11th Cir. 2008).   "Direct evidence of discrimination is 'evidence that, if believed, proves the existence of a fact without inference or presumption.' Under Eleventh Circuit law, 'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.' "   Id. (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (citations and quotation marks omitted)) (internal citation omitted). Booker neither presents nor argues for the existence of statistical proof or direct evidence of discrimination by Winn-Dixie.   Therefore, he must rely on circumstantial evidence to support his discrimination claims.

Booker "may prove his case through circumstantial evidence[ by] using the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)."   Ekokotu v. Boyle, 294 F. App'x 523, 525 (11th Cir. 2008) (citing EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272-73 (11th Cir. 2002), and Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)).

Under the McDonnell Douglas framework, a plaintiff must show an inference of discriminatory intent, and therefore carries an initial burden of establishing a *prima facie* case of discrimination . . . Presenting a *prima facie* case is not onerous as it requires only that the plaintiff establish facts adequate to permit an inference of

discrimination. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted).

The successful assertion of a *prima facie* case then "creates a rebuttable presumption that the employer unlawfully discriminated against" the plaintiff. EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002) (citing U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)). If this occurs, and a *prima facie* case of discrimination is presented, the burden of producing evidence that the employer's action was taken for a legitimate, non-discriminatory reason then shifts to the employer. See Joe's Stone Crabs, 296 F.3d at 1272.

In the last step of the burden-shifting analysis, if the employer meets "its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." Id. at 1272-73 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). The focused inquiry in the last step requires the plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks and citation omitted).

Rioux, 520 F.3d at 127.

However, "[e]stablishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case . . . Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.   A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.' "   Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting Silverman v. Bd. of Educ., 637 F.3d 729, 733 (7th Cir. 2011)) (internal citations and footnote omitted).   See also Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1255-56 (11th Cir. 2012) (applying

<u>Lockheed-Martin</u> in holding that an employee "d[id] not have to use the <u>McDonnell Douglas</u> framework to survive summary judgment because the record contain[ed] enough non-comparator evidence for a jury to reasonably infer that [her supervisor] discriminated against [her] because she was pregnant.").   An inference " 'is not a suspicion or a guess' " but rather " 'a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact[.]' " <u>Lockheed-Martin</u>, 644 F.3d at 1328 n.25 (quoting <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 448 (2d Cir. 1999) (citations and internal quotation marks omitted)).

### 1.      Failure to Promote

To establish a *prima facie* case of discriminatory failure to promote, "the plaintiff must demonstrate only that: (i) he or she belonged to a protected class; (ii) he or she was qualified for and applied for a position that the employer was seeking to fill; (iii) despite qualifications, he or she was rejected; and (iv) the position was filled with an individual outside the protected class." <u>Vessels v. Atlanta Indep. Sch. Sys.</u>, 408 F.3d 763, 768 (11th Cir. 2005) (citing <u>McDonnell Douglas</u>).   As to this claim, Winn-Dixie argues only that Booker cannot establish a *prima facie* case of intentional discrimination because he never applied for a Meat Cutter position.

As Winn-Dixie notes, the Eleventh Circuit has stated: "The application requirement is important to establishing [a] presumption [of discrimination] because it shows that the decision-maker knew about the plaintiff and the plaintiff's interest in the position.   If a decision-maker is unaware of the plaintiff's existence, then he is simply unable to discriminate against h[im], and any presumption of discrimination is unfounded."   <u>Walker v. Prudential Prop. & Cas. Ins. Co.</u>, 286 F.3d 1270, 1275 (11th Cir. 2002) (internal citation omitted). Winn-Dixie argues that it could not have discriminatorily denied Booker a promotion to Meat Cutter because Booker admittedly never applied for a Meat Cutter position, or indeed any

position at all, through the JTS while a Winn-Dixie employee pursuant to Winn-Dixie's formal "Job Posting Policies." See Williams v. Waste Mgmt., Inc., 411 F. App'x 226, 228 (11th Cir. 2011) ("If an employer uses formal procedures to announce positions and identify candidates, the plaintiff must show that he applied for the position." (citing Vessels, 408 F.3d at 768)).[8]

Booker argues that he is only required to show that he might have been reasonably interested in a Meat Cutter position.   In support he cites Carmichael v. Birmingham Saw Works, 738 F.2d 1126 (11th Cir. 1984), which holds in relevant part:

> . . . By showing that he applied, the plaintiff shows that the employer knew he was interested in the job. But when there is no formal notice of the job's availability, the plaintiff may have no means, within his own knowledge, of showing whether the employer considered him or not. Furthermore, when an employer uses such informal methods it has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest.
>
> Accordingly, a plaintiff makes out a *prima facie* case—that is, he creates a presumption of discrimination and forces the employer to articulate legitimate reasons for his rejection—as long as he establishes that the company had some reason or duty to consider him for the post. The employer cannot avoid a Title VII violation by showing that it incorrectly assumed that the plaintiff was uninterested in the job. When the plaintiff had no notice of or opportunity to apply for the job, such a reason for rejection is "legally insufficient and illegitimate". Harris[ v. Birmingham Bd. of Educ.], 712 F.2d [1377,] 1383–84[ (11th Cir. 1983)].

738 F.2d at 1133-34.

Booker claims he is entitled to rely on the Carmichael standard because Winn-Dixie did not formally post or give notice of the specific Meat Cutter vacancies at issue.   There is certainly a genuine issue of fact as to whether notice of the vacancies was posted in the Store itself – while Jean has testified that he hung a sign in the store's front window announcing Meat Cutter openings, Booker and McCants both deny this.   McCants also denies that the Meat Cutter vacancies were posted on a clipboard in the store where vacancies are normally posted.

---

[8] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."   11th Cir. R. 36-2 (effective Aug. 1, 2012).

However, it is undisputed that Winn-Dixie maintains a formal policy for posting and accepting applications for vacancies through the JTS, that Booker had been provided a copy of this policy, that the Store had several computers through which he could access the JTS, and that he never used the JTS to view or apply for vacancies.   Store Director Jean has testified that he posted the Meat Cutter positions on the JTS.   (Doc. 33-3 at 4; Doc. 33-5 at 5).   Booker does not rebut this testimony with evidence, such as testimony by employees who regularly viewed the JTS asserting that the vacancies were not in fact posted there.   Rather, Booker asks the Court to accept absence of corroborating written proof as sufficient rebuttal evidence, claiming that Winn-Dixie produced no copies of job postings for vacancies at the Store during Booker's employment there, despite being asked to do so in discovery.[9]   Booker argues that a reasonable jury could infer from this that the Meat Cutter vacancies were not in fact posted online.   The Court finds that this alleged absence of corroborating evidence cannot sufficiently counter Jean's express testimony and establish a genuine issue of fact.   See Fed. R. Civ. P. 56(c)(1).

Winn-Dixie cites Howell v. Compass Group, 448 F. App'x 30 (11th Cir. 2011), which held that when an employee knew of her employer's policy of posting job vacancies on the internet but failed to check them, she could not excuse her failure to apply for a vacancy even if she was not told about its posting:

> To establish her discriminatory failure to promote claims, Howell had to show that she applied for the 2006 Assistant Director job opening. She did not. As the district court recognized, Howell gave some conflicting testimony about whether she knew that the 2006 job opening was posted on the internet, but there is no dispute that Morrison posted jobs on the internet, the person who got the 2006 Assistant Director position applied for that job on the internet, and Howell did not apply on the internet for it . . .

---

[9]  Winn-Dixie claims that it has produced the job postings, see n.4, *supra*.

. . . We have qualified the [*prima facie*] application requirement with an exception: "[W]here an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show under the second prong that he applied for the position—only that the employer had some reason to consider him for the post." [Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005)]. Here, however, Morrison used the internet to formally announce the 2006 Assistant Director position.   Howell testified repeatedly in her deposition that Morrison posted jobs on the internet. She also testified that she knew how access the job postings through Morrison's website. The person who was awarded the job, Tanya Williamson, applied for it online.

Howell argues that she was not told the job was posted on the internet and that Williamson was told about it, but postings on the internet are available for anyone to see, and Howell admits that she had access to the internet postings. Howell asserts in her brief to this Court that the "secret posting" on the internet "deviated from the normal procedure of posting all jobs at the time clock," but Howell testified in her deposition that "they never have posted jobs in the department, on the bulletin board where people can—the associates can view them and apply for them ... Never."

Howell could have—but did not—access the 2006 Assistant Director job opening when it was posted to the internet. She also could have—but did not—apply for the job. The fact that Howell did not get a job for which she did not apply is not evidence of discrimination. The district court did not err by granting summary judgment in favor of Morrison on Howell's Title VII race discrimination claim.

Howell, 448 F. App'x at 33-34 (footnote omitted).

Here, Booker has presented no evidence rebutting Jean's assertion that he posted the Meat Cutter vacancies to the JTS.   Booker received and signed a copy of the "Job Posting Policies," which explicitly states that vacancies are posted on the JTS.   He could have searched and applied for vacancies on the JTS at any time using computers at the Store but admits he never did.   Both McBride and Lindsey applied through the JTS system.[10]   Booker attempts to distinguish the facts in this case from Howell by pointing out that Winn-Dixie's "Job Posting Policies" limited the posting period to three days, whereas no similarly short time span was

---

[10]  While McBride did initially apply for a Meat Associate position, Bodiford has testified that it is not uncommon for applicants to be considered for open vacancies other than those for which they've applied. (Doc. 38-6 at 24).

identified in <u>Howell</u>.   The Court does not find this distinction material.   The Court also notes that, unlike the plaintiff in <u>Howell</u>, Booker has presented evidence that job vacancies were normally posted by the workplace time clock but the vacancies at issue were not.   However, this issue was not material to the holding in <u>Howell</u>, and similarly it is not material here, especially as Winn-Dixie's "Job Posting Policies" do not mandate the posting of vacancies in such a manner.

Because Booker did not apply for a Meat Cutter position with Winn-Dixie in accordance with its formal "Job Posting Policies," Booker cannot establish a *prima facie* case of discriminatory failure to promote.   Moreover, even discarding <u>McDonnell Douglas</u> analysis, the Court is unable to piece together a "convincing mosaic" from the circumstantial evidence on record from which a reasonable jury could infer an unlawful discriminatory intent in Winn-Dixie's failure to make Booker a Meat Cutter instead of hiring McBride or Lindsey.   <u>Cf.</u> <u>Davis v. Dunn Constr. Co., Inc.</u>, No. 2:10–CV–2075–RDP, 2012 WL 1952125, at *15 (N.D. Ala. May 24, 2012) ("In [<u>Smith v. ]Lockheed–Martin</u>, [644 F.3d 1321, ]the 'convincing mosaic of circumstantial evidence' was extensive: there was a documented history of disparate treatment of Caucasian and African–American employees, a spreadsheet listing the employees by name and race that the defendant's disciplinary review committee used to make discipline decisions, and a news program reporting the defendant's struggles with racism in the workplace.").   For instance, the record lacks examples of overt racial hostility or historical evidence of racial disparity at the Monroeville store.[11]   Booker also admits he never complained to his superiors that he felt discriminated against because he was not made a Meat Cutter.   Also worth noting is

---

[11]   The closest thing to such evidence is Booker's inadmissible hearsay testimony that two unnamed black women told him his first week at the Store that Bodiford and others in the Meat Department were "known to be prejudiced."   (Doc. 38-7 at 28, p. 214).

the lack of evidence of any significant interaction between Booker and Jean, the ultimate decision-maker in hiring Store employees.

Put simply, " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff[,]' " and Booker has failed to present sufficient evidence from which a trier of fact could reasonably find for him on his failure to promote claim.   B/E Aerospace, 376 F.3d at 1086 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 256 (1981)).   Accordingly, Winn-Dixie's Motion for Summary Judgment is due to be **GRANTED** as to Booker's Title VII and § 1981 claims for discriminatory failure to promote.

## 2.      Difference in Pay

"To state a *prima facie* case of intentional discrimination in compensation, a plaintiff must establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage."   Cooper v. Southern Co., 390 F.3d 695, 734-35 (11th Cir. 2004), overruled on other grounds, Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006).   "The comparators must perform jobs similar to the plaintiff's; thus, the plaintiff must show that, in her job, she shared the same type of tasks as the comparators."   Id. at 735 (internal quotation marks omitted).   "The plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects. The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." B/E Aerospace, Inc., 376 F.3d at 1091.

Booker only argues that McBride be considered as a comparator for this claim. Winn-Dixie argues that McBride is not a valid comparator to establish a *prima facie* case of

intentional discrimination because he and Booker are not "similarly situated in all relevant respects."   In support, Winn-Dixie compares the general differences in duties and expectations between a Meat Cutter and a Meat Associate and explains that Booker and McBride at times performed similar duties because Booker was training McBride in Meat Department procedures. The Court finds that Booker has presented sufficient evidence that McBride is a valid comparator, as "most of the time, [McBride] was doing basically the same thing [Booker] was doing, but [Booker] was just cutting more meat than [McBride] was."   (Doc. 38-7 at 8).   In determining if two employees are similarly situated, "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies."   Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999).

However, Booker has not presented evidence to rebut Winn-Dixie's legitimate, non-discriminatory reason for paying McBride higher wages.   The undisputed evidence indicates that Winn-Dixie utilizes a "step structure" pay scale setting wage ranges for various employees, including Meat Associates and Meat Cutters.   Store Director Jean has testified that he made the decision to set McBride's pay at the high end of the part-time Meat Cutter's pay scale because McBride informed him during the interview that he had some experience cutting meat.   Booker argues that there is a genuine issue of material fact as to pretext because McBride was actually hired as a Meat Associate, and the part-time Meat Cutter and part-time Meat Associate pay scales overlap.   However, McBride's claimed previous experience with meat would still give Jean a valid, non-discriminatory reason for setting his pay at the higher end of the Meat Associate pay scale

Booker points out that McBride's application did not list any meat cutting experience and presents evidence indicating that McBride in fact had no prior meat cutting experience, including McBride's own alleged admission.   However, this evidence does not show as pretext Jean's belief that McBride came to the job with some meat cutting experience, which he has testified was based on information learned while interviewing McBride.   "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."   Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010).   An employer's reasons for treating one employee differently from another may be "mistaken[] or unfair[]" but still non-discriminatory.   Id. "The question to be resolved is not the wisdom or accuracy" of an employer's conclusions; rather, the Court's "sole concern is whether unlawful discriminatory animus motivated the decision."   Id. (internal quotation omitted).   While it is conceivable that Jean's belief may have been based on a mistaken remembrance of the interview or on false information given by McBride, Booker has not presented evidence showing that Jean's belief was not genuine and that racial animus was the true motivating factor for paying McBride higher wages than Booker.

As with Booker's failure to promote claim, even ignoring McDonnell Douglas analysis, the record evidence does not establish a "convincing mosaic" of circumstantial evidence from which a reasonable jury could otherwise infer discriminatory intent in the pay disparity between Booker and McBride.   See supra.   Accordingly, Winn-Dixie's Motion for Summary Judgment is due to be **GRANTED** as to Booker's Title VII and § 1981 claims for discriminatory difference in pay.

26

### c.  Title VII Sexual Harassment/Hostile Work Environment

Booker alleges that Winn-Dixie illegally subjected him to a hostile work environment on the basis of his gender through Lindsey's sexual harassment and Bodiford's teasing of Booker about the harassment.[12]  "A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' "  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  "The legal standard for hostile work environment claims in this Circuit is well-settled. To prove a hostile work environment, the plaintiff must show [](1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable."  Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808-09 (11th Cir. 2010) (en banc) (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc) (citation omitted)). Winn-Dixie argues that Booker cannot prove these last two elements.

### 1.      Severe or Pervasive

"Either severity or pervasiveness is sufficient to establish a violation of Title VII."  C.H. Robinson Worldwide, 594 F.3d at 808.   To be actionable as severe or pervasive, the harassment

---

[12]  "[S]ex discrimination consisting of same-sex sexual harassment is actionable under Title VII[.]" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998).

"must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]...to be abusive."   Kenworth, 277 F.3d at 1276 (internal citation and quotation marks omitted).   In other words, the severe or pervasive element has an objective and subjective component.   McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008).   "The Supreme Court has identified four factors to consider in determining whether harassing conduct is sufficiently severe or pervasive to alter an employee's terms or conditions of employment: (1) 'the frequency of the discriminatory conduct,' (2) the severity of the conduct, (3) whether the conduct 'is physically threatening or humiliating, or a mere offensive utterance[,] and' (4) whether the conduct 'unreasonably interferes with the employee's job performance.' . . . Whether the objective component has been satisfied 'can be determined only by looking at all the circumstances.'"   Dar Dar v. Associated Outdoor Club, Inc., 201 F. App'x 718, 721 (11th Cir. 2006) (quoting Harris, 510 U.S. at 23).   See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris, 510 U.S. at 23).   "[W]orkplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context[.]"   Reeves, 594 F.3d at 807. "[S]tatements and conduct must be of a sexual or gender-related nature – sexual advances, requests for sexual favors, or conduct of a sexual nature – before they are considered in determining whether the severe or pervasive requirement is met.   Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted."   Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000) (internal citation and quotations omitted), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)).

Booker provides ample testimony in his deposition that he subjectively viewed both Lindsey's and Bodiford's comments and actions as hostile and abusive, (Doc. 38-7), and Winn-Dixie does not challenge his subjective beliefs.   Though Booker acknowledges Bodiford's comments as being only jokes, rather than more serious matters such as actual sexual advances or requests, (Id. at 20, 24, pp. 183-84, 199-200), he also testified that he "felt humiliated" that Bodiford was making light of a serious matter, (Id. at 27, p. 210).   However, Winn-Dixie does dispute that the alleged harassment and teasing was objectively severe or pervasive.

Booker believes that Lindsey's alleged harassment began around mid-April of 2010. This first incident began with Lindsey asking Booker how he felt about men and whether he was a virgin.   Despite Booker's insistence that he was not interested in discussing such things and did not want to discuss them, Lindsey then offered Booker money in exchange for oral sex, prompting Booker to leave the area.   (Doc. 33-1 at 24, pp. 162-63).

After this initial incident, Lindsey would repeatedly direct sexual comments, including requests for sexual favors, towards Booker.   This would mostly occur when the two men worked alone together.   Taking the entire month of April 2010 into account, time records indicate that Lindsey and Booker worked together only seven days before Booker quit his job at Winn-Dixie.   However, Booker estimates that he worked alone in the Meat Department with Lindsey between two and four hours each of those days.   (Doc. 33-5 at 8, ¶ 28; Docs. 33-12 & -14; Doc. 38-7 at 24, p. 197).   Booker describes Lindsey's sexual comments as a "constant thing" and that he would "repeat the same things over and over again to [Booker][,]" even though Booker "kept giving him the same response."   (Doc. 38-7 at 21, pp. 187-88).   Lindsey asked Booker multiple times if he had reconsidered Lindsey's initial offer of money for sex,

29

sometimes tapping or rubbing Booker on the shoulder when doing so and expressing confidence that Booker would eventually accept.   When Lindsey did this, Booker would "usually have to shove [Lindsey's] arm off, and tell him, leave me alone, cut that out; I don't play that, Freddie." Other specific examples of Lindsey's comments are:   (1) asking Booker how he felt about anal sex and whether he would involve himself in it, possibly for money; (2) repeatedly asking whether Booker was a "virgin;" (3) discussing anal sex, "messing with other men," "boys and boys, gay things," etc.; and (4) questioning Booker's sexual orientation, claiming that he was only pretending not to be "gay."   (Id. at 21-22).   Two other examples – Lindsey squeezing Booker's arms and commenting on his physique, and at least once telling him, "Don't let those boys get you when you get off work, . . . you're going to do it eventually[,]" (Id.) – while seemingly ambiguous in isolation, could also be viewed as more sexually charged in the context of Lindsey's other actions.

While the frequency of the events would likely not meet the required level set in this Circuit, a plaintiff need not present evidence establishing every one of the aforementioned "severe or pervasive" factors in order to prevail on a hostile work environment claim.   See Kenworth, 277 F.3d at 1277 ("[H]aving established the frequency, severity, and humiliating nature of the conduct, Miller's failure to establish convincingly how Galpin's conduct interfered with his duties is not fatal to his hostile environment claim, given the totality of the circumstances.").   Sufficient evidence has been presented from which a reasonable person could determine that the harassment itself – explicit sexual comments, including multiple propositions for sexual favors, coupled with mocking comments from a supervisor suggesting that Booker give in to such propositions – was severe, that it was humiliating, and that it would unreasonably interfere with an employee's working conditions by creating an uncomfortable working

atmosphere.   Certainly there is sufficient evidence to find that it interfered with Booker's working conditions, as he states that he "loved working at Winn-Dixie until [Lindsey] came along[.]"   (Doc. 38-7 at 24, p. 197).   Viewing the totality of the evidence in the light most favorable to Booker, the Court finds that there is a genuine issue of material fact as to whether the harassment Booker allegedly endured from Lindsey was sufficiently severe to violate Title VII.

Booker also claims that Bodiford would make jokes at his expense because of Lindsey's harassment.   He identifies three distinct inappropriate comments by Bodiford – once telling Booker to "give Freddie some sugar," once singing him the song "sugar on my tongue, tongue, yippie, yippie, yum, yum," and referring to Lindsey as "Freaky Freddie" to Booker when Lindsey wasn't around.   (Id. at 20, pp. 183-84).   Viewed in isolation, Bodiford's actions could be considered "simple teasing, . . . [which] will not amount to discriminatory changes in the terms and conditions of employment."   Faragher, 524 U.S. at 788.   Again, however, evidence of harassment must be viewed in context.   Bodiford only began making these jokes after Booker informed him that he was being sexually harassed by Lindsey, another male, and the specific jokes Booker identifies could easily be interpreted as referring to Lindsey's proposition to Booker.   Nevertheless, Bodiford's conduct could not reasonably be determined to be severe or pervasive sexual harassment.   "Title VII, as it has been aptly observed, is not a 'general civility code[,]' "   Gupta, 212 F.3d at 583 (quoting Faragher, 524 U.S. at 788) (quotation altered), and it "does not operate as a general ban on ... rude or offensive behavior.' "   Leslie v. Cumulus Media, Inc., 814 F. Supp. 2d 1326, 1343 (S.D. Ala. 2011) (quoting Weaver v. Potter, No. CV 110-005, 2010 WL 2465423, at *4 (S.D. Ga. Apr. 21, 2010) (citation omitted)).   Thus,

although Bodiford's actions are evidence supporting Booker's claims, standing alone they do not constitute actionable sexual harassment.

### 2.      Basis for Holding Winn-Dixie Liable

"The test for employer liability depends on whether the harasser is a co-worker or a supervisor."   Edwards v. Hyundai Motor Mfg. Ala., LLC, 603 F. Supp. 2d 1336, 1347 (M.D. Ala. 2009) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998); see also Beckford v. Dep't of Corr., 605 F.3d 951, 961 (11th Cir. 2010) (" 'One standard exists for harassment by supervisors and another for harassment by coworkers' and third parties." (quoting Erickson v. Wis. Dep't of Corr., 469 F.3d 600, 604 (7th Cir. 2006)).   In Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), the U.S. Supreme Court held that employer liability is automatic when the supervisor's harassment culminates in a "tangible employment action, such as discharge, demotion, or undesirable reassignment."   Faragher, 524 U.S. at 807, 808; Ellerth, 524 U.S. at 762, 763.

In support of his argument that Lindsey could be considered his supervisor, Booker cites Store Director Jean's testimony stating that full-time Meat Cutters have the authority to direct the actions of Meat Associates and can order them to do "whatever needs to be done in the department[,]" including wrapping meat and cleaning.   (Doc. 38-8 at 10-12). (Doc. 38-8 at 10-12).   However, "a 'supervisor' is not merely a person who possesses authority to oversee plaintiff's job performance but a person with the power directly to affect the terms and conditions of the plaintiff's employment."   Bryant v. Jones, 575 F.3d 1281, 1300 (11th Cir. 2009) (citing Andonissamy v. Hewlett-Packard Co., 547 F.3d 841, 848 (7th Cir. 2008)).[13]   An ability to

---

[13]      In support of his argument that Lindsey could be considered his supervisor, Booker cites Dinkins

"direct[] working activities . . . [is] not in and of [itself] sufficient to make someone a supervisor

under Title VII."   Andonissamy, 547 F.3d at 848 (citing Rhodes v. Ill. Dep't of Transp., 359

F.3d 498, 506 (7th Cir. 2004)).   Rather, a supervisor is "generally a person with 'the authority

---

v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1254 (M.D. Ala. 2001) (DeMent, J.), which held "that an employee is a supervisor or 'agent' for purposes of Title VII if he has the actual authority ... to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks[.]"   133 F. Supp. 2d at 1266 (citing Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 513 (11th Cir. 2000)).   See also Edwards v. Hyundai Motor Mfg. Ala., LLC, 603 F. Supp. 2d 1336, 1347 (M.D. Ala. March 27, 2009) (Thompson, J.) (" 'A supervisor need not necessarily be high in the business structure, nor does he have to have the authority to hire, fire, or promote, in order to be considered an agent whose conduct is binding on an employer.' " (quoting Sims v. Montgomery County Com'n, 766 F. Supp. 1052, 1069 (M.D. Ala.1990)).   However, in reaching this holding, Judge DeMent first rejected the defendant employer's urging that he apply the Seventh Circuit's "terms and conditions" analysis for determining supervisory status as enunciated in Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1034 (7th Cir. 1998), finding such analysis to be overly simplistic.   Dinkins, 133 F. Supp. 2d at 1266.

In Bryant v. Jones (issued July 31, 2009), the Eleventh Circuit appears to have since taken a more favorable view of the Seventh Circuit's analysis.   Cf. Wilborn v. S. Union State Cmty. Coll., 720 F. Supp. 2d 1274, 1298-99 (M.D. Ala. 2010) (Thompson, J.) ("As a preliminary matter, the court must address whether Lee and Conaway acted as 'supervisors' with respect to Wilborn. The Eleventh Circuit Court of Appeals has "held that 'a 'supervisor' is not merely a person who possesses authority to oversee [a] plaintiff's job performance but a person with the power directly to affect the terms and conditions of the plaintiff's employment.' " Lewis v. United States DOL, 368 Fed. Appx. 20, 31–32 (11th Cir.2010) (quoting Bryant v. Jones, 575 F.3d 1281, 1300 (11th Cir. 2009)). While the Court of Appeals has done little to elaborate on what constitutes a 'power directly to affect the terms and conditions of the plaintiff's employment,' even under a narrow reading, a reasonable jury could conclude that Lee and Conaway were supervisors.[FN14]   Compare Parkins v. Civil Constr., Inc., 163 F.3d 1027, 1034 (7th Cir. 1998) ("This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee."), with Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1254, 1266 (M.D. Ala. 2001) (DeMent, J.) ("[A]n employee is a supervisor ... for purposes of Title VII if he has the actual authority to take tangible employment actions ... or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks.") (emphasis added). Truck Program participants were required to pass multiple written and performance tests to complete the program, and Lee and Conaway each administered and graded one or more of those tests. Thus, each had the ability to increase her workload and to prevent her from completing the program." (FN14: "Although a broader interpretation is perhaps most consistent with Faragher, 524 U.S. at 781, 118 S. Ct. 2275, where the Supreme Court found that an employee 'responsible for making ... daily assignments, and for supervising [other employees'] work and fitness training' was a supervisor.")).

The Supreme Court will consider a case in its upcoming term, Vance v. Ball State University, 11-556, addressing the issue of "whether the 'supervisor' liability rule of Faragher-Ellerth (i) applies to harassment by those whom the employer vests with authority to direct and oversee their victim's daily work, or (ii) is limited to those harassers who have the power to 'hire, fire, demote, promote, transfer, or discipline' their victim."   Marc A. Starrett & Wilson F. Green, The Appellate Corner, The Alabama Lawyer, Sept. 2012, at 312, 314.

to hire, fire, promote, demote, discipline, or transfer …' "  Id. (quoting Rhodes, 359 F.3d at 506).   No evidence has been presented indicating that Lindsey possessed any such authority as a full-time Meat Cutter.   Therefore, there are insufficient facts from which to find that Lindsey was Booker's supervisor.

"If the harasser is a co-worker, the claim is governed by a negligence standard[.]" Edwards, 603 F. Supp. 2d at 1347.   "Employer liability in a case involving sexual harassment by a co-worker exists when the employer knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action."  Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000) (citing Henson, 682 F.2d at 905).   "Actual notice is established by proof that management knew of the harassment."  Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003) (citing Kenworth, 277 F.3d at 1278). "Constructive notice, on the other hand, is established when the harassment was so severe and pervasive that management reasonably should have known of it."  Id.

"When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established."  Id.   Winn-Dixie argues that it was not put on actual notice of Lindsey's harassment because Booker did not fully comply with the Open Door Policy in reporting it.   Specifically, because Booker admits not using the alternative reporting options available in Step Three of the policy (i.e. contact a Human Resources representative or use W-DIAL), Winn-Dixie argues that he was required to report pursuant to Steps One and Two to establish actual notice.

Booker relies on Breda v. Wolf Camera & Video, 222 F.3d 886 (11th Cir. 2000), to argue that Winn-Dixie was sufficiently put on actual notice of the harassment when Booker reported it

to Bodiford in accordance with Step One.    Breda explains as follows:

[W]hether [Store Manager] Sharpley had *apparent* authority sufficient to render Appellee [employer] liable is irrelevant because Sharpley had *actual* authority to receive complaints of harassment on behalf of the company. Appellee had a clear employment policy stating: "Anyone who believes that he or she is being subjected to harassment or who has witnessed such harassment must immediately notify his or her manager. If the problem is not immediately resolved, that associate should contact the Personnel Department." In Coates v. Sundor Brands, Inc., 164 F.3d 1361 (11th Cir.1999), we held that if an employer has a company policy specifically designating the person or persons to whom an employee should report instances of suspected sexual harassment, once the employee complains to the designated person or persons, the employer is deemed to have actual notice of the harassment. See id. at 1364. With such a policy, the employer "itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures." Id.; see also Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1300 (11th Cir. 2000) (concluding the employer had established when it had been given sufficient notice by specifically designating the company representatives who should be contacted in cases of suspected harassment).

When an employer has a policy for reporting harassment that is clear and published to its employees, and an employee follows that policy, the employer's notice of the harassment is established by the terms of the policy. Through its policy, the employer has given the designated person explicit *actual* authority to handle the complaints. Whether the designated person has *apparent* authority is not relevant to the inquiry-his or her actual authority already has been established through the terms of the employer's policy.

Consequently, if a company has a clear and published policy that outlines the procedures employees must follow in reporting cases of suspected harassment, courts determining whether employer liability has been established need not delve into the internal policies of the company to determine whether the person to whom the complaints of harassment were made had the apparent authority to respond to such complaints. Furthermore, employees of such companies who believe they are victims of harassment need not be concerned with whether they pursued their complaints far enough up the company ladder. The sole inquiry when the employer has a clear and published policy is whether the complaining employee followed the procedures established in the company's policy.

In this case, by specifically designating store managers as the company representatives to whom complaints of sexual harassment must be made, Appellee itself has established that information provided to store managers constitutes actual notice to Appellee. It is undisputed that Sharpley was the store manager of the location at which Appellant was employed. It is also undisputed that Appellant complained to Sharpley about [co-worker] Morris' alleged harassment on at least four or five occasions. Appellant therefore followed the procedures outlined in Appellee's

policy.[FN4] Consequently, we hold the district court erred in concluding Appellant's complaints to Sharpley were insufficient as a matter of law to provide actual notice of the harassment to Appellee.

> FN4    Appellee's policy states an employee *must* complain of suspected harassment to his or her store manager, and *should* contact the Personnel Department if the problem is not resolved. Thus, while Appellee's policy suggests that an employee pursue the matter with the Personnel Department if the harassment continues, the only mandatory requirement of the policy is that the store manager be informed of the harassment. We therefore reject Appellee's argument that it should not be deemed to have actual notice of the harassment because Appellant did not follow the policy's suggestion to complain beyond Sharpley; Appellee's employees need not act in a manner not required by Appellee's own policy.

Breda, 222 F.3d at 889-90.

As noted in footnote 4 of Breda, the employer in that case presented the same argument that Winn-Dixie does in this case: that an employee's failure to follow both steps of the employer's two-step harassment reporting policy was insufficient to deem that the employer had actual notice of harassment.   The Breda court rejected this argument because under the terms of the employer's own policy, only the first step – reporting harassment to a store manager – was mandatory, while the second step was merely a suggested follow-up that the employee "should" follow.

Such is not the case with Winn-Dixie's policies.  Its harassment policy states that harassment "*must* be reported" pursuant to the Open Door Policy.   (Doc. 33-7 at 2 (emphasis added)).   Because Booker did not use either alternate reporting option available in Step Three, he was therefore required to use the process set out in Steps One ("discuss your concerns with your immediate Supervisor") and Two ("discuss your concerns with a second level manager" if the immediate supervisor does not adequately address the issue within seven days).   (Doc.

33-8).   Unlike the second step in <u>Breda</u>, Step Two in Winn-Dixie's Open Door Policy does not use language which renders it a mere suggestion or optional step – rather, it gives a direct command of what an employee must do should Step One fail to address his or her concerns. Booker complied with Step One by reporting to Market Manager Bodiford, supervisor of the Meat Department.   However, Bodiford admits, and Booker does not dispute, that he took no action to address Booker's concerns, and evidence indicates he even began teasing Booker about Lindsey – therefore, it is clear Bodiford did "not answer[] or satisfactorily address[] [Booker's] concerns[.]"   (<u>Id</u>.)   Booker's own words indicate that he wanted Bodiford to take action and was unsatisfied with Bodiford's failure to address the harassment.   (Doc. 38-7 at 27).   As such, he was then required by Step Two to report his concerns to a second level manager, which he admits he did not do.

As the <u>Breda</u> court noted, an employer may set out in its policies "*the person <u>or</u> persons to whom an employee should report instances of suspected sexual harassment,*" with the employer being deemed to have actual notice of harassment "once the employee complains to the *designated person <u>or</u> persons*[.]"   222 F.3d at 889 (emphasis added).   Here, Booker did not report the harassment according to Winn-Dixie policy – therefore, Winn-Dixie cannot be *deemed* to have actual notice of it.

However, the fact that Winn-Dixie is not *deemed* to have actual notice does not end the discussion or form a basis for summary judgment for Winn-Dixie.   Following the written policy is simply the sure way for a plaintiff to survive summary judgment on the issue of notice. Booker can also establish actual notice by showing that he reported the sexual harassment to a manager or agent of Winn-Dixie who had authority to address the matter.   <u>Blue Circle</u>, 324 F.3d at 1259 ("Actual notice is established by proof that management knew of the harassment.").

Bodiford was clearly designated as an agent of Winn-Dixie to receive and address sexual harassment complaints.   Moreover, there is evidence that Store Manager Jean was also aware of Booker's complaints.   Accordingly, there is sufficient evidence from which a reasonable jury could impute actual notice to Winn-Dixie.

Therefore, Winn-Dixie's Motion for Summary Judgment is due to be **DENIED** as to Booker's Title VII claim for hostile work environment.

### d.  Constructive Discharge

In his First Amended Complaint, Booker alleges that he "was constructively discharged when he resigned because the hostile working environment created by the harassment had become intolerable[.]"   (Doc. 17 at 6, ¶ 25).   The Supreme Court has held that "[a] hostile-environment constructive discharge claim entails something more" than just an actionable atmosphere of sexual harassment or hostility; rather, "[a] plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."   Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). "[H]arassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts."   Id. at 148.   "[W]hen an official act does not underlie the constructive discharge, the [Burlington Indus., Inc. v. ]Ellerth and Faragher[ v. City of Boca Raton] analysis . . . calls for extension of the affirmative defense to the employer."   Id.

In its brief in support of summary judgment, Winn-Dixie argues two reasons why Booker's claim for constructive discharge should be dismissed.   The first, that Booker cannot sustain a claim of constructive discharge because he cannot prove his claim of hostile work environment, is easily rejected, as the Court has previously determined that sufficient evidence

38

exists to support Booker's hostile work environment claim.    Moreover, the Court finds that the evidence, when viewed in the light most favorable to Booker, shows working conditions "so intolerable" that a reasonable jury could determine that "a reasonable person would have felt compelled to resign[,]" Suders, 542 U.S. at 147 – repeated and explicit sexual harassment by a co-worker despite Booker's objections, coupled with a supervisor who did nothing to stop the harassing behavior and in fact began mocking Booker because of the harassment.

The second argument focuses on Booker's admission that his pay disparity with McBride was a factor in his decision to quit working at Winn-Dixie, as well as the harassment he endured. (Doc. 33-1 at 33-34, pp. 209-14).   Because Booker admits never complaining of his pay disparity with McBride or that he felt he was being discriminated against because of his race, Winn-Dixie argues that it was not put on notice of these issues, could not therefore have addressed them, and as such cannot be liable for hostile work environment.   See Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996) ("A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation."); Jones v. USA Petroleum Corp., 20 F. Supp. 2d 1379, 1383 (S.D. Ga. 1998) ("Obviously an employer cannot be given sufficient time to remedy, for example, a hostile environment, if it is not provided notice of it.").

The Court has already determined that Booker's discriminatory pay claim fails – therefore, he would not be entitled to use this claim to support a claim for constructive discharge. Moreover, Booker states that the sexual harassment he endured was "about ninety-nine percent" of why he quit Winn-Dixie and was "the main thing," with the pay disparity being "about one percent" of his reasons for leaving.   (Doc. 38-7 at 31, pp. 229-30).   Winn-Dixie has cited no authority which convinces the Court that Booker's constructive discharge claim must fail simply

because he has stated that another alleged form of unlawful activity, other than hostile work environment, played a small role in his decision to resign.   Pay disparity, in conjunction with other evidence, can be used to support a constructive discharge claim.   Cf. Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 978 (11th Cir. 2003) ("Moreover, unequal pay cannot, standing alone, constitute a constructive discharge.").   Winn-Dixie cites Taylor v. Roche, 196 F. App'x 799, 803 (11th Cir. 2006), in support of its argument that Booker's "mixed reason" for leaving precludes his assertion of constructive discharge.   In Roche, however, the Eleventh Circuit affirmed the dismissal of an employee's constructive discharge claim because evidence showed that the "real reason" for the plaintiff-employee's retirement was severe pain from an old injury, rather than intolerable working conditions imposed by his employer.   Id.   This holding does not compel the dismissal of Booker's claim of constructive discharge in this case.   As Winn-Dixie itself observed, "a constructive discharge claim involves only an objective standard," (Doc. 32 at 34 (quoting Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231(11th Cir. 2001)), and a reasonable jury could determine that Booker's working conditions were objectively intolerable solely due to the harassment he endured.

Therefore, Winn-Dixie's Motion for Summary Judgment is due to be **DENIED** as to Booker's claim for constructive discharge.

### e.  Invasion of Privacy

"To succeed on a claim alleging invasion of privacy relating to sexual harassment, a plaintiff must show: (1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation."   Ex parte Atmore Cmty. Hosp., 719 So. 2d 1190, 1194 (Ala. 1998) (citing Busby v. Truswal Sys. Corp., 551 So. 2d 322, 323

40

(Ala. 1989)).   Winn-Dixie argues that Lindsey's conduct was not sufficiently intrusive to be actionable, as "a sexual proposition alone is insufficient to constitute the type of extreme and outrageous conduct required to establish an invasion of privacy claim[.]"   (Doc. 32 at 38 (citing McIsaac v. WZEW-FM Corp., 495 So. 2d 649, 651 (Ala. 1986) ("Even the dire affront of inviting an unwilling woman to illicit intercourse has been held by most courts to be no such outrage as to lead to liability." (quotation marks omitted)))).

"In Phillips[v. Smalley Maintenance Services, Inc., 435 So. 2d 705 (Ala.1983)], th[e Alabama Supreme] Court held that extensive egregious inquiries into one's sex life, coupled with intrusive and coercive sexual demands, constituted a wrongful intrusion into one's private activities sufficient 'to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.' "   Stevenson v. Precision Standard, Inc., 762 So. 2d 820, 826 (Ala. 1999) (quoting Phillips, 435 So. 2d at 711).   In Armstrong v. Standard Furniture, 197 F. App'x 830 (11th Cir. 2006), plaintiff Armstrong testified that defendant Denson "regularly (1) made sexual comments in the workplace; (2) stated 'daily' that he wanted to have sex with Armstrong; (3) groped Armstrong while she was working; and (4) regularly inquired whether Armstrong was menstruating because he wanted some 'cat.'   [Plaintiff] Sims testified that Denson would (1) constantly talk about sex; (2) regularly brush up against her; (3) comment about her legs; and (4) come up to Sims "licking his tongue out" at her."   197 F. App'x at 834.   Applying Alabama law, the Eleventh Circuit held that, based on such behavior, "a jury could find that Denson intruded upon Armstrong's and Sims's sex lives in an offensive manner and, therefore, invaded their right to privacy."   Id.

In this case, Booker has presented evidence that he was subject to repeated and unwanted sexual propositions by Lindsey, as well as unwelcome touching, discussions of explicit sexual

41

subjects, and inquiries into his sex life, such as whether he was a virgin, how he felt about anal sex, whether he was interested in having sex for money, and whether he was pretending not to be "gay."   As in Armstrong, a reasonable jury could find that such comments and actions intruded upon Booker's sex life and subjected him to shame or humiliation.

Although Winn-Dixie has not addressed the issue, the Court feels it necessary to determine whether there is a basis for holding Winn-Dixie liable for Lindsey's invasion of Booker's privacy.   " ' "For an employer to be held liable for the intentional torts of its agent, the plaintiff must offer evidence (1) that the agent's wrongful acts were committed in the line and scope of the agent's employment; or (2) that the acts were committed in furtherance of the business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts." ' "   Machen v. Childersburg Bancorporation, Inc., 761 So. 2d 981, 984 (Ala. 1999) (quoting Mardis v. Robbins Tire & Rubber Co., 669 So. 2d 885, 889 (Ala.1995) (quoting Potts v. BE & K Constr. Co., 604 So. 2d 398, 400 (Ala. 1992))).   " 'The employer is *vicariously liable for acts of its employee* that were done for the employer's benefit, i.e., acts done in the line and scope of employment or ... done for the furtherance of the employer's interest.   The employer is *directly liable for its own conduct* if it authorizes or participates in the employee's acts or ratifies the employee's conduct after it learns of the action.' "   Id. at 984-85 (quoting Potts, 604 So. 2d at 400) (emphasis added).

The evidence does not indicate that Lindsey's harassment was committed within the line and scope of his employment, or that it was done in furtherance of Winn-Dixie's business, or that Winn-Dixie authorized or participated in it.   In order to show that a defendant employer ratified its agent's behavior, a plaintiff must show that the employer "either expressly adopted [the agent]'s alleged conduct or that [the employer] implicitly approved of it."   Id. at 985 (citing

42

Potts, 604 So. 2d at 400).   "[I]n addition to proving the underlying tortious conduct of an offending employee, a complaining employee must show: '(1) [that her employer] had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) *that the employer failed to take 'adequate' steps to remedy the situation*.' " Id. (quoting Potts, 604 So. 2d at 400 (emphasis added)).   There is sufficient evidence from which a reasonable jury could conclude that Winn-Dixie, through Bodiford or Jean, 1) had actual notice of Lindsey's harassment of Booker, 2) either knew or should have known that such behavior constituted sexual harassment and/or tortious activity, and 3) did not adequately address or remedy the situation despite this notice.   As such, a reasonable jury could conclude that Winn-Dixie ratified Lindsey's conduct.

Therefore, Winn-Dixie's Motion for Summary Judgment is due to be **DENIED** as to Booker's claim for invasion of privacy.

### f.   Negligent and/or Wanton Supervision, Training, and/or Retention

Winn-Dixie has argued that these claims must fail because there is no independent cause of action on which to base them.   Under Alabama law, "a party alleging negligent supervision … must prove the underlying wrongful conduct of the defendant's agents."   Univ. Fed. Credit Union v. Grayson, 878 So. 2d 280, 291 (Ala. 2003) (citing Voyager Ins. Cos. v. Whitson, 867 So. 2d 1065, 1073 (Ala. 2003)).   See also Jones Express, Inc. v. Jackson, 86 So. 3d 298, 305 (Ala. 2010) ("[I]mplicit in the tort of negligent hiring, retention, training, and supervision is the concept that, as a consequence of the employee's incompetence, the employee committed some sort of act, wrongdoing, or tort that caused the plaintiff's injury.").   "Alabama does not

43

recognize an independent cause of action for sexual harassment. Instead, claims of sexual harassment are maintained under common-law tort theories such as assault and battery, invasion of privacy, negligent training and supervision, and outrage." Stevenson v. Precision Standard, Inc., 762 So. 2d 820, 825 n.6 (Ala. 1999). As stated *supra*, Booker has presented sufficient evidence showing that Lindsey unlawfully invaded his privacy, thereby providing a basis for asserting negligent and/or wanton supervision, training, and/or retention by Winn-Dixie.

Winn-Dixie also argues that Booker's negligent supervision and training claims should fail because there are insufficient bad acts on which to base them. Specifically, Winn-Dixie cites to the Court's previous holding that "one instance of misconduct is insufficient to establish liability against the employer under a negligent supervision/training claim. " Leslie v. Cumulus Media, Inc., 814 F. Supp. 2d 1326, 1348 (S.D. Ala. 2011) (DuBose, J.) (citing Southland Bank v. A & A Drywall Supply Co., 21 So. 3d 1196, 1216 (Ala. 2008)). This holding, however, does not apply to the facts in this case. In Leslie, the Court found that, where a co-worker's only inappropriate action against the plaintiff was emailing her one sexually explicit photograph, claims against the plaintiff's employer for negligent supervision and training of that employee could not be sustained. Id. at 1338, 1348. In so holding, the Court noted that the plaintiff "submitted no evidence of previous complaints of sexual harassment involving Coleman, whether with her or any other employee[.]" Id. at 1348. This case, on the other hand, involves allegations of multiple harassing acts by a coworker.

"In the context of a sexual harassment claim, '[t]o recover on negligent supervision and training claims against an employer, "[a] plaintiff must establish by affirmative proof" that the employer actually knew of the incompetence [of the employee], or that the employer reasonably should have known of it. Southland Bank v. A & A Drywall Supply Co., 21 So. 3d 1196,

1215–16 (Ala. 2008) (citation omitted) (explaining that claims for negligent supervision and training are treated as one claim subject to the same standard) ... The plaintiff meets this burden by either showing "specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice." Lane v. Cent. Bank of Ala., N.A., 425 So. 2d 1098, 1100 (Ala. 1983) (citation omitted).' " Leslie, 814 F. Supp. 2d at 1347-48 (quoting Speigner v. Shoal Creek Drummond Mine, 402 F. App'x 428, 433 (11th Cir. 2010)).

"Likewise, a claim for wanton supervision requires the plaintiff to establish by affirmative proof that the employer actually knew of the employee's incompetence or reasonably should have known of it. See [Armstrong Bus. Servs., Inc. v. ]AmSouth Bank, 817 So. 2d [665,] 683[ (Ala. 2001).  ' "Wanton supervision" requires that the employer wantonly disregard its agent's incompetence.' Id. at 682. Wanton conduct constitutes 'the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.' Pritchett[v. ICN Med. Alliance, Inc.], 938 So. 2d [933, ]941 (citation omitted); see also Ala. Code § 6–11–20(b)(3)." Speigner, 402 F. App'x at 433.

Booker has presented evidence showing both that Lindsey engaged in multiple incidents of misconduct, that such misconduct was brought to the attention of Market Manager Bodiford (twice, by Booker), Seafood Manager Sherry Davis, and Store Manager Jean (by Seafood Manager Sherry Davis), as well as other Monroeville Store employees, and that no steps were taken to correct the misconduct. By reporting Lindsey's misconduct to Store management, Booker brought the misconduct "home to the knowledge of the master," Winn-Dixie, such that it

could be held liable for negligent supervision, training, and/or retention of Lindsey.   Moreover, a reasonable jury could find that Winn-Dixie wantonly committed these offenses.   Despite Booker's reporting to management, nothing was done to correct or prevent Lindsey's misconduct.   Rather, evidence indicates that Bodiford consciously determined not to act on Booker's two complaints of harassment to him.   At the very least, by the time he received Booker's second complaint, Bodiford should have been conscious that his failure to discipline Lindsey would probably result in continued harassment of Booker.

Therefore, Winn-Dixie's Motion for Summary Judgment is due to be **DENIED** as to Booker's claims for negligent and/or wanton supervision, training, and/or retention.

**V.     Conclusion**

Accordingly, it is **ORDERED** that Defendant Winn-Dixie's Motion for Summary Judgment (Doc. 31) is **GRANTED** as to Booker's Title VII and § 1981 claims for discriminatory disparate pay and failure to promote and is **DENIED** as to Booker's other claims. Winn-Dixie's Motion to Strike (Doc. 44) is **DENIED in part** and **MOOT in part**, as set out above.

**DONE** and **ORDERED** this the **6**[th] day of **November 2012.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**